Grant T. RODERER, M.D. and Advanced Pain Centers of Alaska, Inc., Appellants,

v.

Deborah DASH, Appellee.

No. S–13106.

Supreme Court of Alaska.

July 2, 2010.

Matthew K. Peterson and Linda Johnson, Clapp, Peterson, Van Flein, Tiemessen & Thorsness, Anchorage, and Sanford M. Gibbs, Brown, Waller & Gibbs, P.C., Anchorage, for Appellants.

George M. Kapolchok, Kapolchok Law Offices, Anchorage, and Cheryl Mandala and Matthew Singer, Jermain Dunnagan & Owens, P.C., Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, WINFREE, and CHRISTEN, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

Deborah Dash brought a medical malpractice claim against Dr. Grant Roderer based on a procedure he performed to relieve her back pain. A jury awarded Dash roughly $1.4 million in compensatory damages. The superior court awarded Dash costs under Alaska Civil Rule 79 and attorney's fees under Alaska Civil Rule 68. Dr. Roderer appeals from the denial of his motions to dismiss, for judgment notwithstanding the verdict, and for a new trial. He also appeals the order awarding fees and costs. We affirm the superior court's denial of these motions and the court's award of costs, and conclude that the court's fee award was invited error.

## II. FACTS AND PROCEEDINGS

### A. Dash's Pain And Treatment

Dash began experiencing pain in her back, right hip, knee, and foot in early 2001. She managed her pain using a combination of over-the-counter drugs and Vicodin.

Dash first saw Dr. Roderer, of Advanced Pain Centers of Alaska (APCA), in August of 2002. Dr. Roderer's first treatment of Dash involved injecting steroids into her spine. These treatments began in August 2002 and continued for several months, but did not provide sufficient relief. Dr. Roderer then performed a discogram[1]—an invasive diagnostic procedure—on October 22, 2002. The procedure revealed problems with three of Dash's discs. Dr. Roderer and Dash discussed the results of the discogram and the possibility of Intradiscal ElectroThermal Therapy (IDET) as a treatment. Dash agreed to undergo the IDET procedure and Dr. Roderer performed it at Providence Hospital on three of Dash's spinal discs. The IDET procedure involves insertion of a small, wire-like heating element into a disc. The element is then heated to roughly 194 degrees Fahrenheit. Dash testified that she was unconscious during the procedure except for a brief period when she was roused by "insane pain." The procedure left Dash initially unable to walk. Roughly two weeks after the procedure, Dash's medication was no longer sufficient to manage her pain and her husband persuaded Dr. Roderer's office to prescribe an alternative—apparently Oxy-Contin. About a month after the procedure, Dash successfully transitioned from using a wheelchair to using a walker.

Dash was evaluated by Dr. Onorato, a neurologist, on March 7, 2003. Dr. Onorato had been treating Dash for migraines and another nerve condition for several years. Dr. Onorato diagnosed nerve damage at "L5–S1" that affected Dash's ability to use her left leg.[2]

Dash moved to Idaho in March of 2003. At that point she began receiving treatment through the Idaho Pain Center.

### B. The Dashes File Suit

Dash and her husband, David Dash, filed suit against Dr. Roderer and APCA on December 14, 2004.[3] They alleged that the IDET caused nerve damage which led to increased pain, decreased mobility, and decreased quality of life for Dash. They alleged that Dr. Roderer failed to exercise the degree of skill and care necessary to perform the IDET properly, and failed to obtain Dash's informed consent to the procedure. They also alleged that David Dash suffered damages from loss of society and loss of consortium.

### C. The Dashes' Offer Of Judgment

On July 28, 2006 the Dashes conveyed a settlement offer pursuant to Rule 68. The document offered "to allow judgment to be entered against defendants Grant T. Roderer, M.D., and Advanced Pain Centers of Alaska, Inc., in the amount of $450,000.00 inclusive of costs, pre-judgment interest, and attorney fees, in complete satisfaction of plaintiffs' claims." The document was signed by the Dashes' attorney's secretary "for and with permission of" the attorney. The offer was not accepted.

In October 2006 counsel for the Dashes and Dr. Roderer stipulated to dismiss David Dash as a party to the case. This stipulation was approved by the superior court in November 2006.

### D. Expert Report Issue

Dr. Roderer moved to dismiss the plaintiff's complaint on October 27, 2006 because Dash had failed to file an expert report by the court's August 10, 2006 pre-trial deadline. Dash's attorney filed an opposition, along with a "working draft" of the report of Dash's expert, Dr. Eric Boyd. Dr. Roderer replied to Dash's opposition with a "Notice of Continuing Non–Compliance and Request for Ruling" in which he questioned the authenticity of the "working draft." In response, Dash's attorney explained that he, not Dr. Boyd, had authored the "working draft," and

---

**1.** At trial, the terms "discogram" and "discography" were used interchangeably.

**2.** "L5–S1" designates a particular disc in the spinal column. The IDET procedure Dr. Roderer performed on Dash involved treatment of three discs; one of them was the L5–S1 disc.

**3.** Dash's claims against APCA were asserted only via the doctrine of respondeat superior; the parties treated the two defendants as a single entity for purposes of this case. This opinion refers to the defendants as "Dr. Roderer" for simplicity.

asked the court for a continuance so that an adequate expert report could be obtained. The superior court granted the continuance and denied the motion to dismiss but ordered that Dash pay Dr. Roderer's attorney's fees incurred because of the delay. The court also ordered that Dash's attorney pay a $2,500 sanction, that no further continuances would be allowed, and that failure to abide by the court's order would result in dismissal of the action. A final version of Dash's expert report was later produced.

## E. Trial And Verdict

Trial was held before a jury beginning June 25, 2007. The jury heard testimony from medical experts for both parties. Dr. Roderer moved for a directed verdict at the close of evidence, arguing that there was not sufficient evidence to support a finding that Dash suffered a severe permanent impairment. The motion was denied as to the alleged injury at L5–S1 but granted as to injuries at other locations.[4]

The jury found that Dr. Roderer was negligent in treating Dash, that he failed to get her informed consent before performing the IDET procedure, that these failings were legal causes of harm to Dash, and that Dash "suffers from one or more severe permanent physical impairments." The jury awarded Dash $1,404,618 in compensatory damages for past and future economic and non-economic losses.

Dr. Roderer moved for relief from the verdict under three alternative theories: (1) judgment notwithstanding the verdict, based on the argument that the preparation of Dash's expert report violated the civil rules and warranted dismissal; (2) a new trial, either on the merits or limited to damages, based on the argument that Dash had not introduced sufficient evidence and the jury's award was a product of "passion and/or prejudice"; and (3) remittitur, based on the argument that the jury's award of damages was

not adequately supported by the evidence. All of these motions were denied.

## F. Award Of Attorney's Fees

On July 9, 2007 Dash filed a motion for entry of final judgment to include prejudgment interest and attorney's fees. Because the amount the jury awarded was greater than the Rule 68 settlement offer, Dash argued that she was entitled to an award of fifty percent of her "reasonable actual" attorney's fees under Rule 68. She measured her reasonable actual attorney's fees as the amount she was obligated to pay under her attorney's contingent fee agreement: forty percent of her total gross recovery if the case went to trial. Dash requested an award of attorney's fees in the amount of fifty percent of the amount of fees owed under the contingency fee agreement, or $319,654.87.[5]

Dr. Roderer opposed the motion for fees. He argued that the purported Rule 68 offer of judgment was invalid for three reasons: (1) it was made to two defendants; (2) it was made by two plaintiffs; and (3) it was signed by Dash's attorney's secretary, not Dash's attorney. Dr. Roderer also demanded that Dash's attorney "submit an accounting of time and services performed and his hourly rate" to allow Dr. Roderer to challenge time spent on improper projects, such as writing the "working draft" of Dr. Boyd's expert report.

In response, Dash argued that the settlement offer was valid and that Rule 68 did not require an itemized billing record in the circumstances of this case. Dash explained that her "actual fees will be 40% of the total gross recovery. These fees are reasonable and in fact standard. Plaintiff lawyers do not keep track of their time for billing purposes."

The superior court rejected Dr. Roderer's arguments, initially ordering him to pay fifty percent of the fees owed under the contingency agreement. But Dr. Roderer argued

---

4. Dr. Roderer also argued that there was no evidence the IDET procedure injured Dash's spine at locations other than L5–S1. This part of the motion was not opposed. Dash's theory at trial was that the L5–S1 injury caused all of the loss for which she sought compensation.

5. Dash's attorney calculated that the jury's award of damages plus interest totalled $1,598,274.35. 40% of this total is $639,309.72.

that the court should reduce the attorney's fee award to avoid compensating Dash for work her attorney did before serving the offer of judgment.[6] Dr. Roderer argued that of the hours billed by his attorney, only seventy percent were incurred after the offer was made and that unless Dash's attorney could show a different pattern of work, Dash's attorney's fees should be reduced by at least thirty percent. Dash agreed to that reduction and the superior court awarded attorney's fees accordingly.

### G. Award Of Costs

Dash moved for costs under Rule 79 and included an itemized cost bill. Dr. Roderer opposed, arguing that the court should strike the motion because it was not signed by Dash's attorney. The opposition compared copies of the signature that appeared on the request for costs against the signature that appeared on an earlier affidavit of Dash's attorney. Though both signatures are in Dash's attorney's name, the two signatures are not similar. Dr. Roderer argued that Dash's attorney had not personally signed the motion for costs, and that this posed two problems: (1) Alaska Civil Rule 11 requires that pleadings, motions and other papers filed on behalf of a represented party must be signed by an attorney; and (2) Rule 79 requires that the request for costs must be itemized and verified, imposing an independent requirement that Dash's attorney personally review and sign the motion. Dr. Roderer also questioned certain entries in the bill, asked that Dash be required to produce receipts, and requested that the charges be reviewed by the clerk of court.

The superior court did not strike the motion for costs, referring it instead to the clerk

"for determination." The court denied Dr. Roderer's motions for post-trial relief from the jury's verdict and entered final judgment. Dr. Roderer appeals.

## III. STANDARD OF REVIEW

 We review a trial court's imposition of discovery sanctions for abuse of discretion.[7] When reviewing a denial of a motion for judgment notwithstanding the verdict, we "review the record in a light most favorable to [sustaining the verdict], and reverse only if reasonable and fair-minded persons would invariably have found" other than the jury found.[8]

 When reviewing an order denying a motion for a new trial, we will affirm "if there is an evidentiary basis for the jury's decision," [9] and will only reverse "if the evidence supporting the verdict was so completely lacking or slight and unconvincing as to make the verdict plainly unreasonable and unjust." [10]

 We review awards of attorney's fees for abuse of discretion and will reverse "if the award is arbitrary, capricious, manifestly unreasonable, or improperly motivated." [11] We review the interpretation of the civil rules authorizing fee awards de novo.[12]

## IV. DISCUSSION

### A. The Superior Court's Refusal To Dismiss Dash's Case As A Discovery Sanction Was Not An Abuse Of Discretion.

 Dr. Roderer argues that the superior court erred by denying his pre-trial motion to dismiss. Dr. Roderer argued that Dash's

---

**6.** Rule 68 only authorizes enhanced attorney's fee awards for fees incurred after an offer of judgment is made. Alaska R. Civ. P. 68(b).

**7.** *Keen v. Ruddy,* 784 P.2d 653, 658 (Alaska 1989).

**8.** *Poulin v. Zartman,* 542 P.2d 251, 273 (Alaska 1975) (citing *City of Fairbanks v. Nesbett,* 432 P.2d 607, 609–10 (Alaska 1967)), *overruled on other grounds by State v. Alex,* 646 P.2d 203, 208 n. 4 (Alaska 1982).

**9.** *Hogg v. Raven Contractors, Inc.,* 134 P.3d 349, 352 (Alaska 2006) (quoting *Glamann v. Kirk,* 29

P.3d 255, 259 (Alaska 2001)) (internal quotation marks omitted).

**10.** *Id.*

**11.** *Rhodes v. Erion,* 189 P.3d 1051, 1053 (Alaska 2008) (quoting *Kellis v. Crites,* 20 P.3d 1112, 1113 (Alaska 2001)) (internal quotation marks omitted).

**12.** *Marron v. Stromstad,* 123 P.3d 992, 998 (Alaska 2005) (citing *Glamann,* 29 P.3d at 259).

complaint should have been dismissed when her attorney authored the "working draft" of her expert's report and filed it with the court.[13] We conclude the superior court did not err when it denied Dr. Roderer's motion to dismiss.

Dr. Roderer moved for dismissal because Dash failed to timely file an expert witness report. To avoid dismissal, Dash filed a "working draft" of Dash's expert witness's report. The document was unsigned and it was on blank paper rather than letterhead. The pleading that accompanied it did not disclose that the working draft was the work product of Dash's counsel. It stated: "The report ... is not signed by Dr. Boyd, but this is being accomplished." Upon learning that Dash's attorney authored the document, Dr. Roderer argued that Dash's case should be dismissed with prejudice. The superior court determined that Dr. Roderer's motion to dismiss was in fact a motion for summary judgment, denied the motion, granted a continuance of the trial date, and sanctioned Dash's attorney. The superior court explained that:

> [e]ffectively, this [m]otion to [d]ismiss is really a motion for litigation-ending sanctions for violation of this court's discovery orders; namely, the deadline for filing expert reports. Alaska Civil Rule 37(b)(3)(E) provides that if a party willfully violates a court order to provide discovery, the court may dismiss a claim or defense.

Citing the preference for addressing the merits of a case, the court declined to impose litigation-ending sanctions, but did impose "significant sanctions." The court ordered Dash to pay Dr. Roderer "all costs associated with the continuance," sanctioned Dash's attorney $2,500, and warned that further failure to comply with the court's discovery orders would result in "dismissal of this case."

■ "A superior court's imposition of sanctions under Alaska Rule of Civil Procedure 37(b) for a party's failure to comply with a discovery order is ... reviewed for abuse of discretion."[14] A decision constitutes abuse of discretion if it is "arbitrary, capricious, manifestly unreasonable, or ... stems from an improper motive."[15]

We have explained that "the sanction of dismissal is only allowed in extreme cases because a party should not be barred from his or her day in court where an alternative remedy would suffice to make the adverse party whole."[16] In other cases we have closely scrutinized the imposition of litigation-ending sanctions,[17] explaining:

> Because of the extreme nature of dismissal ... before a case is dismissed the trial court must first find (1) that the non-complying party acted willfully to violate the order in question, (2) that there is resulting prejudice to the opposing party, and (3) that the imposed dismissal is sufficiently related to the violation at issue. In addition, the court must consider a reasonable exploration of alternatives to dismissal and whether those alternatives would adequately protect the opposing party as well as deter other discovery violations.[18]

**13.** Roughly one month after Dr. Roderer's motion to dismiss was converted into a motion for summary judgment and denied, Dr. Roderer filed a "Notice of Withdrawal of Defendants' Summary Judgment Without Prejudice." Dash argues that Dr. Roderer waived his argument regarding the expert witness report because he withdrew his motion for summary judgment and failed to renew it. But the court denied the summary judgment motion on February 7, 2007; the "notice of withdrawal" was therefore without effect. Further, Dr. Roderer renewed the underlying argument in his motion for judgment notwithstanding the verdict. The superior court addressed the claim on the merits, holding that "it was appropriate both then and now to have denied dismissal of the case." Dr. Roderer did not waive this issue.

**14.** *Lee v. State,* 141 P.3d 342, 347 (Alaska 2006) (citing *DeNardo v. ABC Inc. RVs Motorhomes,* 51 P.3d 919, 922 (Alaska 2002)).

**15.** *Shea v. State, Dep't of Admin., Div. of Ret. and Benefits,* 204 P.3d 1023, 1026 (Alaska 2009) (quoting *Dobrova v. State, Dep't of Revenue, Child Support Servs. Div.,* 171 P.3d 152, 156 (Alaska 2007)).

**16.** *DeNardo,* 51 P.3d at 922 (quoting *Hughes v. Bobich,* 875 P.2d 749, 752 (Alaska 1994)) (internal quotation marks omitted).

**17.** *See, e.g., id.* at 922–27.

**18.** *Id.* at 922–23 (citing Alaska R. Civ. P. 37(b)(3); *Hughes,* 875 P.2d at 753).

The superior court took the situation seriously, recognizing that "[t]his is a case where litigation-ending sanctions may be appropriate," but because the court was able to devise alternative sanctions that would "alleviate ... the monetary prejudice to the defendants," the court concluded that "significant sanctions, short of litigation-ending sanctions, are warranted here."

It is well settled that the superior court has wide discretion in imposing sanctions for violation of its discovery orders.[19] In this case, it is not clear that dismissal was required to "adequately protect the opposing party as well as deter other discovery violations,"[20] and we do not otherwise find the superior court's decision arbitrary, capricious, or manifestly unreasonable. The superior court's decision was a conscious, measured response to the discovery violation. We do not believe the superior court abused its discretion when it sanctioned Dash's attorney and denied Dr. Roderer's motion to dismiss.

After the verdict, Dr. Roderer sought judgment notwithstanding the verdict on the same basis as his earlier motion to dismiss—Dash's failure to file a timely expert witness report and the working draft filed with the court. The motion for judgment notwithstanding the verdict expanded on this argument with information acquired from the expert in discovery.[21] For the reasons already discussed, we find that the superior court's denial of this motion was not an abuse of its discretion and we decline to overturn it.

### B. Dr. Roderer Is Not Entitled To Judgment Notwithstanding The Verdict.

▮ Dr. Roderer argues on appeal that the jury's verdict cannot stand because Dash failed to present sufficient evidence to allow the jury to find all of the elements of Dash's negligence claim. Dr. Roderer made two

motions for a directed verdict during trial, but neither was on this ground.

Alaska Civil Rule 50(b) provides that judgment notwithstanding the verdict may be entered only "in accordance with [a previously entered] motion for a directed verdict." Dr. Roderer's first motion for directed verdict was made before the close of evidence, and the superior court reserved judgment on it. The second, made after the close of evidence, made two arguments: (1) Dash did not present sufficient evidence to support a finding of "severe permanent physical impairment;" and (2) Dash did not present evidence to support an argument that the procedure Dr. Roderer performed injured Dash in locations other than "L5–S1."[22] Dr. Roderer did not seek a directed verdict on the ground that Dash had not presented sufficient expert witness testimony to support jury findings on standard of care, breach, or causation.

We have explained that "[w]here a party fails to move for a directed verdict at the close of the evidence, a superior court's refusal to grant a judgment n.o.v. cannot be considered on appeal."[23] Dr. Roderer's failure to move for a directed verdict on the grounds he now asserts would have precluded him from moving for judgment notwithstanding the verdict on those grounds before the superior court. His failure to make this argument in the trial court precludes him from making it on appeal.

### C. Dr. Roderer Is Not Entitled To A New Trial.

Dr. Roderer argues that the superior court should have granted his post-verdict motion for a new trial. In this motion, Dr. Roderer argued that: (1) a jury instruction wrongly created an "irrefutable presumption" of a breach of duty; and (2) Dash failed to present sufficient expert testimony to sustain a

**19.** *Lee,* 141 P.3d at 349 (explaining that "Alaska Civil Rule 37(b) gives judges broad discretion to enforce discovery orders through sanctions." (citing *DeNardo,* 51 P.3d at 922).)

**20.** *DeNardo,* 51 P.3d at 923.

**21.** In his deposition, Dr. Boyd confirmed that he had not been "aware of the need for an expert report" at the time the working draft was filed

with the court, and that he first began work on his report shortly before its submission in March of 2007.

**22.** *See supra* note 4.

**23.** *Richey v. Oen,* 824 P.2d 1371, 1374 (Alaska 1992) (citing *Metcalf v. Wilbur, Inc.,* 645 P.2d 163, 170 (Alaska 1982)).

verdict on negligence. Dash argues that the jury instruction challenge is waived, that the challenge itself is without merit, and that the jury's finding on informed consent renders moot the claim that there was insufficient evidence to support the negligence claim.[24] We agree with Dash on each of these points.

### 1. The jury instructions do not support Dr. Roderer's request for a new trial.

Dr. Roderer argues that the jury's verdict should be vacated because jury instruction 25.1 probably led the jury to believe that Dr. Roderer's inability to produce Dash's consent form or additional photographs documenting the IDET procedure was sufficient grounds for imposing liability on Dr. Roderer. Dash argues that Dr. Roderer waived this argument by failing to articulate it distinctly before the instructions were given. We agree that the objection was waived, but also consider the merits of the argument and find that giving the instruction was not reversible error.

### i. The objection Dr. Roderer raises on appeal was not raised at trial.

■ Alaska Civil Rule 51(a) bars a party from arguing on appeal that a jury instruction was improper unless the party "objects thereto before the jury retires … stating distinctly the matter to which the party objects and the grounds of the objection." We have explained that the rule "is intended to ensure that a trial judge is clearly made aware of the precise nature of the alleged error,"[25] and we have interpreted this rule to require a relatively specific articulation, before the trial court, of the same argument raised on appeal.

In *Van Huff v. Sohio Alaska Petroleum Co.*, an employee suing for wrongful termination objected to an instruction that would have immunized the employer if the termination was for a "legitimate business purpose."[26] The employee argued at trial that the instruction should explain that the business purpose had to be reasonable; but on appeal, the employee argued that the instruction should have defined "legitimate business purpose."[27] We declined to consider this argument on appeal, finding it to be "entirely different" from that raised at trial.[28] Similarly, in *Hout v. NANA Commercial Catering,* a plaintiff alleging employment discrimination objected to jury instructions on the grounds that they placed too heavy a burden on the plaintiff.[29] On appeal, Hout argued that the instructions were flawed because they were "not based on the principles advanced by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*,"[30] a federal employment discrimination case articulating the burden-shifting rules now commonly applied in such cases.[31] We held that this argument was waived for failure to articulate it at trial:

> The issue is not properly before this court because Hout failed to submit to the trial court instructions that were patterned after the *McDonnell Douglas* decision and did not object to the court's proposed instructions on this ground. She objected generally to the instructions, saying they placed on her a heavy burden, but she did not distinctly state the grounds of her objection or suggest corrective language consistent with *McDonnell Douglas* principles.[32]

Dash offered jury instruction 25.1, and Dr. Roderer objected to it. But the circum-

---

24. Dash had two independent theories of liability: lack of informed consent and negligent performance of the procedure itself. She argues that either theory is adequate to support the jury's award.

25. *Girves v. Kenai Peninsula Borough*, 536 P.2d 1221, 1223 (Alaska 1975) (quoted with approval in *Van Huff v. Sohio Alaska Petroleum Co.*, 835 P.2d 1181, 1186 (Alaska 1992)).

26. 835 P.2d at 1186–87.

27. *Id.* at 1187.

28. *Id.*

29. 638 P.2d 186, 189 (Alaska 1981).

30. *Id.*

31. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793–807, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

32. *Hout*, 638 P.2d at 189.

stances of Dr. Roderer's objections to jury instruction 25.1 are similar to those in *Hout.* As it was initially proposed, jury instruction 25.1 contained two paragraphs. The first read: "A physician is required to make and keep records of his patients' treatment." The second paragraph referred to a specific record Dr. Roderer had not produced. Dr. Roderer's counsel objected to identifying the specific record, calling it "argumentative." The superior court removed the second paragraph and asked Dr. Roderer if he objected to the remaining sentence, "A physician is required to make and keep records of his patient's treatment." Dr. Roderer's counsel responded:

> Well, I'd still object to that because it's not—there's not a factual issue for them to decide relating to that one way or the other, and so I would object to that in its entirety but it's—I think it's substantially [im]proved by taking out that second paragraph but I—just for the record, I object to the whole instruction.

The court gave the single-sentence instruction to the jury.

On appeal, Dr. Roderer contends that this instruction may have caused the jury to believe that Dr. Roderer could be held liable for failure to obtain informed consent on the basis of the record missing from Dash's patient file. But this argument was not specifically raised before the superior court. Had it been, the superior court could have evaluated whether to add further instructions to clarify that liability for failure to obtain informed consent requires more than proof that Dr. Roderer failed to keep his records properly. As it is, in accordance with the standard for waiver applied in *Hout* and *Van Huff,* we find this argument waived. .

**33.** *Conam Alaska v. Bell Lavalin, Inc.,* 842 P.2d 148, 153 (Alaska 1992) (internal citations and footnote omitted).

**34.** Dr. Roderer claims that Dash's closing argument contained such an implication, but we do not find the closing argument troubling. Dash's counsel pointed out that certain records of the drugs Dash was taking after the IDET were missing, and then stated that "the judge will instruct

### ii. Giving jury instruction 25.1 was not plain error.

■■■ Absent a specific objection at trial that complies with Rule 51(a), we "will not review [a] jury instruction unless the giving of the challenged instruction was plain error. Plain error will be found when an obvious mistake exists such that the jury instruction creates a high likelihood that the jury will follow an erroneous theory resulting in a miscarriage of justice." [33] Dr. Roderer argues that jury instruction 25.1, while generally "a correct statement" of the law, was incorrect in this instance and should not have been given because it may have led the jury to apply an erroneous theory of liability. Specifically, he argues that the jury might have concluded that Dr. Roderer should be found liable for Dash's injuries because some of Dash's medical records were missing from her file. Dr. Roderer asserts that the instruction may have led the jury to believe that the mere fact that some of Dash's medical records were missing, by itself, established that he was negligent or had not obtained informed consent. There was no argument presented at trial along the lines Dr. Roderer suggests.[34]

The special verdict form required that the jury separately determine whether Dr. Roderer (1) was negligent, (2) failed to obtain Dash's informed consent, and, if so, whether each failure was a legal cause of harm to Dash. The jury answered yes to each of these questions. A review of the jury instructions explaining negligence and informed consent refutes Dr. Roderer's argument. The only instruction purporting to define negligence, instruction 11, defined negligence as "the failure to meet the standard of care"; it explained that the jury must "determine the standard of care only on the basis of [the] opinions offered by [the doctors] who have testified as expert witnesses on the standard of care." Thus, the jury had no basis to

you that the doctor has an absolute duty to make accurate records and to keep them." Dash's counsel went on to argue that this failing was part of a broader pattern of inconsistencies or lapses of memory that cast serious doubt on the credibility and reliability of Dr. Roderer's testimony. We do not believe this argument suggested that the missing record, alone, established liability or negligence.

conclude that the failure to keep adequate records, without more, constituted negligence.

Even if the jury did find that Dr. Roderer's failure to keep records breached his duty of care, they were instructed that to impose liability based on negligence they had to also find that the negligence was a legal cause of the harm Dash suffered. Dr. Roderer has not suggested how the conclusion that the failure to keep adequate records constituted negligence was reasonably possible under the facts of this case, and it is improbable that the jury imposed liability on this basis.

It is also unlikely that the instruction affected the jury's finding on informed consent. Dr. Roderer's concern seems to be that the jury might have used instruction 25.1 as a basis from which to infer that Dr. Roderer's failure to produce a record of informed consent meant that he failed to obtain informed consent. But the jury had strong evidence before them supporting plaintiff's informed consent claim. The jury heard the Dashes testify about what they were and were not told about the risks of the procedure and their testimony amply supports the jury's finding that Dash did not give informed consent. For example, Dash testified that Dr. Roderer claimed to have performed hundreds of IDETs but he later admitted that Dash's procedure "may have been" the first three-level IDET he had ever performed. Dash also testified she was never told that the procedure might result in nerve damage. Dr. Roderer testified that he typically obtains a written acknowledgment of informed consent, that he did so here, that he typically sends a copy to Providence Hospital when the procedure will be performed there, but that he could not locate a copy of the consent form he asserts Dash signed before undergoing the IDET. Considering this evidence, we do not find merit in Dr. Roderer's contention that jury instruction 25.1 "created a high likelihood" that the jury followed an erroneous theory. We conclude that giving jury instruction 25.1 was not plain error.

## 2. The jury's finding on informed consent renders moot any failure of evidence on the negligence claim.

■ Dr. Roderer argues that Dash's expert testimony was not sufficient to allow the jury to find each of the elements of negligence. Dash counters that even if the expert testimony was insufficient to support the jury's finding that Dr. Roderer negligently performed the IDET procedure, the jury's finding that Dr. Roderer failed to obtain Dash's informed consent is sufficient to sustain the jury's award. We agree with Dash. The informed consent finding was not challenged by Dr. Roderer on appeal and it independently supports the jury's liability finding. For this reason, we do not reach Dr. Roderer's argument regarding the sufficiency of the evidence supporting the negligence claim.

## D. The Rule 68 Offer Was Valid And The Method Used To Calculate Fees Was Invited Error.

Dr. Roderer argues that the award of attorney's fees under Rule 68 should be vacated for three reasons: (1) Rule 68 was not applicable because Dash's settlement offer was not signed by Dash's attorney; (2) the offer did not trigger Rule 68 because it "was not inclusive of [all] the relationships of the parties" and presented apportionment problems; and (3) the award amount was improperly calculated because the superior court relied upon Dash's contingency fee agreement and did not require itemization of the hours her attorney worked. We conclude that the Rule 68 offer was valid. Though the method used to calculate attorney's fees was incorrect, we conclude that the erroneous calculation was invited error. We affirm the award of attorney's fees.

## 1. The Dashes' attorney was not required to sign the offer.

■ Dr. Roderer argues that the Dashes' offer of judgment did not trigger Rule 68 because it was signed by the Dashes' attorney's secretary "for and with permission of" the attorney, rather than by the attorney himself. The superior court agreed that Rule 11's signature requirement applied to the offer of judgment, but concluded that it was "within the discretion of the court to

strike the [o]ffer of [j]udgment," and declined to do so. We conclude that the offer of judgment did not violate Rule 11.

In pertinent part, Rule 11 states:

Every pleading, motion and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name.... The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless expense in the cost of litigation. If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant.[35]

Dr. Roderer cites no authority to support his contention that a Rule 68 offer of judgment is subject to Rule 11's signature requirement, and we have never addressed this issue. The Dashes' Rule 68 offer of judgment was addressed to and served on Dr. Roderer's attorney, as is typical when issuing such offers. Offers of judgment are filed with the court only upon acceptance or, if rejected, in conjunction with post-trial motions for fees. Here, the offer of judgment was submitted to the court as an attachment to Dash's July 9, 2007 Motion for Entry of Final Judgment, Award of Prejudgment Interest, and Award of Attorney Fees. The motion was signed by counsel. This filing satisfied the requirements of Rule 11.

### 2. The multiplicity of parties and claims did not prevent the offer from triggering Rule 68.

■ Dr. Roderer argues that the Dashes' offer did not trigger Rule 68 because it was "not inclusive of the relationships of the parties" and presented apportionment problems. Dr. Roderer argues: (1) because "David Dash had an independent claim" that was "distinct and separate" from Deborah Dash's claim, the offer of judgment did "not meet the test for joint offers set by this court in *John's Heating Service v. Lamb*"; and (2) because "there were two separate and distinct claims brought against Dr. Roderer and Advanced Pain Centers, apportionment would have been difficult."

The test for whether a multi-party offer of settlement triggers Rule 68 is described in *John's Heating Service v. Lamb*.[36] In that case, we held that an offer will trigger the rule if: (1) "the offer was inclusive of all the relationships among the parties and their conflicting claims," which means that the "settlement offer clearly indicated all claims between the parties would be resolved if the offer were accepted" and (2) "no apportionment difficulty existed."[37] The superior court addressed Dr. Roderer's claim that the *John's Heating* test was not met, rejecting it with little explanation. The question whether a settlement offer triggers Rule 68 is a legal one that this court reviews de novo.[38]

The Dashes offered to accept a certain sum of money "in complete satisfaction of plaintiffs' claims." This language "clearly indicated" that if the offer was accepted, "all claims between the parties would be resolved."[39] The claims against APCA were based solely on respondeat superior. We have not addressed this particular application of respondeat superior before, but we do not find that it presents an apportionment problem given the facts of this case.[40] None of

---

**35.** Alaska R. Civ. P. 11.

**36.** 46 P.3d 1024 (Alaska 2002).

**37.** *Id.* at 1042 & n. 85 (quoting *Taylor Constr. Servs., Inc. v. URS Co.*, 758 P.2d 99, 102 (Alaska 1988)) (internal quotation marks omitted).

**38.** *See Sayer v. Bashaw*, 214 P.3d 363, 364 (Alaska 2009) (citing *Mackie v. Chizmar*, 965 P.2d 1202, 1204 (Alaska 1998)).

**39.** *John's Heating Serv.*, 46 P.3d at 1042 n. 85 (quoting *Taylor*, 758 P.2d at 102) (internal quotation marks omitted).

**40.** Both the jury instructions and the special verdict form in this case explicitly directed that

the parties ever contended that APCA was exposed to liability for any reason other than via the doctrine of respondeat superior. We have consistently held that settlement offers do not trigger Rule 68 if they would leave unresolved serious disputes that, absent settlement, would have to be resolved by a jury,[41] but we conclude under the circumstances of this case that the Dashes' offer did not present an apportionment problem.

### 3. The superior court's calculation of Rule 68 fees was invited error.

■ Dr. Roderer argues that the superior court erred when it calculated Dash's attorney's fee award. Rule 68 authorizes trial courts to award a percentage of a party's "reasonable actual attorney's fees incurred by the offeror [of an offer of judgment] from the date the offer was made...."[42] Dash's attorney represented her pursuant to a written fee agreement that called for forty percent of Dash's "total gross recovery."[43] The court accepted the amount of fees Dash owed her attorney under their contingent fee agreement as her total "reasonable, actual fees" and used defense counsel's hourly time records to approximate the fees she incurred after the date of the Rule 68 offer of judgment. Dr. Roderer argued that fees under Rule 68 cannot be based on a contingency fee and requested that Dash's attorney provide itemized bills.

■■ In *Marron v. Stromstad,* we addressed a request for itemization in conjunction with a Rule 68 motion for fees and held that, "where the rule authorizes reasonable actual fees, a court may not award attorney's fees to a party who has not itemized his or her requested fees, when the opposing party has requested such itemization."[44] Dash's counsel did not keep track of the hours he actually worked on the case, but the superior court accepted the contingency fee award as a measure of plaintiff's "reasonable, actual fees." Dr. Roderer's counsel then argued that even if itemized bills could not be produced, Dr. Roderer should only be responsible for the portion of the contingency fee reflecting work performed after the July 28, 2006 offer of judgment. Dr. Roderer's counsel argued to the superior court that:

> [Dash's] attorney did not keep track of his time, which is why [Dash] does not want to provide her attorney's actual time spent. [Dr. Roderer's] attorney did keep track of his time, and believes that it is a reasonable estimate of fees in this instance.... [R]oughly 30% of [Dr. Roderer's attorney's] time on the case was prior to the offer of judgment, and 70% after offer through trial.... [A]t a minimum, [Dr. Roderer] should only be responsible for ... 70% of one half of the contingency fee....

As we acknowledged in *Marron,* a superior court may not award attorney's fees "based only on an estimate of what fee amount [is] reasonable."[45] Though we have never suggested that Rule 68 is limited to cases where the fee-seeking party is obliged to pay his or her attorney by the hour,[46] the percentage of total hours worked by Dr. Roderer's attorney after July 28, 2006 cannot be described as Dash's counsel's "reasonable, actual fees" during the same time period. The superior court's reliance on Dr. Roderer's attorney's time records to measure the number of hours Dash's counsel worked was error. But this

Dr. Roderer and APCA be treated as a single entity. *Cf. Pagenkopf v. Chatham Electric, Inc.,* 165 P.3d 634, 641 n. 28 (Alaska 2007) (employee and employer treated as individual Rule 68 offeror where employer's liability premised entirely upon respondeat superior).

41. For example, in *Pagenkopf,* 165 P.3d at 640–44, the settlement offer might have precluded any recovery from a third-party defendant, who otherwise stood to be held liable separately and apportioned a distinct percentage of the fault.

42. Alaska R. Civ. P. 68(b).

43. The agreement defines "total gross recovery" as the sum of damages, interest on the damages, and any court-ordered awards of attorney's fees. Awards of costs are excluded from "total gross recovery."

44. 123 P.3d 992, 1014 (Alaska 2005).

45. *Id.* at 1013.

46. *Cf. Froines v. Valdez Fisheries Dev. Ass'n, Inc.,* 175 P.3d 1234 (Alaska 2008) (affirming award of attorney's fees for plaintiff represented under a contingent fee agreement could be based on attorney's hourly rate and hours worked).

method of calculation was suggested by Dr. Roderer. Invited error "occurs when the court takes erroneous action at the express request of [a party], and then [that party] urges reversal on that basis on appeal." [47] "When an error is invited, an appellate court examines the error to see if there is an 'exceptional situation' where reversal is necessary to preserve the integrity of the judicial process or to prevent a miscarriage of justice." [48] In our view, the facts of this case do not rise to this level. The integrity of the judicial process was not threatened by the superior court's use of Dr. Roderer's proposed estimate of attorney's fees where Dr. Roderer agreed that this was "reasonable" and the court had no basis to conclude otherwise. Though the trial court erred by adopting this method of calculating Dash's fees, reversal of the award of attorney's fees is not necessary under the doctrine of invited error. We therefore affirm the superior court's award of fees.

### E. The Award Of Costs Was Proper.

 Dr. Roderer argues that the superior court should have struck Dash's request for costs because it was not signed by Dash's attorney. The request for costs was signed in Dash's attorney's name, but Dr. Roderer argued—and the superior court agreed—that the signature did not resemble the one typically used by Dash's attorney. Dash's attorney filed an affidavit asserting that the signature was his own and the superior court refused to strike the request for costs. The court noted that (1) Dash's attorney stated that the signature was his own in an affidavit, and (2) the remedy for an unsigned document under Rule 11 would be to require the attorney to sign the pleading. The superior court ordered that "in this case (and in other cases in which [the attorney] is before this judge) [the attorney] use only one signature for all documents he signs and files with the court, and it should be the one that is filed with the Complaint or Answer."

We review a superior court's refusal to strike a pleading under Rule 11 for abuse of discretion. Because the attorney affirmed, in a signed affidavit, that the signature on the contested document was his own, we find that the superior court did not abuse its discretion by failing to strike the pleading. We find no error in the trial court's award of costs.

## V. CONCLUSION

We AFFIRM the superior court's denial of Dr. Roderer's motions to dismiss, for judgment notwithstanding the verdict, and for a new trial. We also AFFIRM the court's award of fees and costs.

FABE and EASTAUGH, Justices, not participating.

**47.** *Barrett v. State,* 772 P.2d 559, 568 n. 10 (Alaska App.1989).

**48.** *Parson v. State, Dep't of Revenue, Alaska Hous. Fin. Corp.,* 189 P.3d 1032, 1038 (Alaska 2008).